# In the Iowa Supreme Court

No. 24–0882

Submitted April 16, 2025—Filed May 16, 2025

**In the Matter of Property Seized for Forfeiture from Bitcoin Depot Operating, LLC.**

**Bitcoin Depot Operating, LLC,**

Appellant,

vs.

**Carrie Carlson,**

Appellee.

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, judge.

A contracting party seeking return of funds seized by law enforcement appeals a district court order directing that the funds be returned to the other contracting party. **Reversed and Case Remanded with Instructions.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Matthew A. McGuire (argued), Kevin Collins, and Roy Leaf of Nyemaster Goode, P.C., Des Moines, for appellant.

Konnor Hodges (argued) and Christopher Stewart of Boles Witosky Stewart Law PLLC, Des Moines, for appellee.

**Oxley, Justice.**

This appeal involves the disposition of $14,100.00 in cash that the Linn County Sheriff's Office seized from a Bitcoin ATM kiosk in Cedar Rapids as part of a fraud investigation. After the seized funds were no longer required for the investigation, Bitcoin Depot, the owner of the ATM, filed an application for return of seized property pursuant to Iowa Code section 809.5 (2024). Carrie Carlson, the customer who deposited the $14,100.00 into the Bitcoin ATM, filed a motion to intervene and a competing application for return of seized property. Following a hearing on the competing claims, the district court ordered the Linn County Sheriff's Office to return the seized funds to Carlson. Bitcoin Depot appealed.

On our de novo review, we conclude that Bitcoin Depot has the greater right to possession of the seized funds. As explained more fully below, the district court erred in ordering the Linn County Sheriff's Office to return the seized funds to Carlson. We therefore reverse the district court order and remand the case with instructions to return the seized funds to Bitcoin Depot.

I.

On February 9, 2024, Carlson withdrew $14,100.00 in cash from her personal bank accounts. That same day, she deposited $14,100.00 worth of $100 bills into a Bitcoin ATM kiosk located inside an Amoco gas station in Cedar Rapids. Simultaneously with Carlson's deposit of the $14,100.00 cash into the ATM, Bitcoin Depot transferred a corresponding amount of Bitcoins (0.22960970 Bitcoins) to the private Bitcoin wallet identified by Carlson. When a customer deposits cash into a Bitcoin ATM in exchange for Bitcoins, she must answer a prompt that asks if the Bitcoins are going to her own digital wallet or someone

else's wallet. If the customer selects that the Bitcoins are going to a wallet not owned by the customer, the following warning appears:

> ## WARNING:
>
> Bitcoin Depot® terms of service require all users to use Bitcoin wallets that they own. You selected that you do not own the wallet you are attempting to use.
>
> Never scan a QR code that has been provided to you from a 3rd party. Remember all Bitcoin transactions are final and irreversible. QR codes provided to you by government entities including the IRS, law enforcement, employers, technical support companies, and significant other could be scams.
>
> Please contact Bitcoin Depot customer support if you have questions about scams: 678-435-9604
>
> In order to proceed you will need to create your own Bitcoin wallet and provide the Bitcoin wallet address QR code from that wallet.
>
> **Start new transaction with my own Bitcoin wallet**

Thus, to complete her transaction, Carlson would have had to represent to Bitcoin Depot that she owned the private Bitcoin wallet to which she directed Bitcoin Depot to transfer the Bitcoins.

Shortly after, Carlson made a report to the Linn County Sheriff's Office that she had been defrauded. Specifically, Carlson alleged that on or about February 8, a person claiming to be from the "Geek Squad" contacted her, told her that her accounts had been compromised, and directed her to purchase Bitcoins and have them placed in a specified wallet to avoid her accounts being "impacted." Based on Carlson's report, the Linn County Sheriff's Office obtained and executed a search warrant at the Bitcoin ATM on or about February 12. The Bitcoin ATM had not been emptied since Carlson's transaction. So, the Linn

County Sheriff's Office was able to identify and seize the bills that Carlson had deposited for its fraud investigation.

On February 21, Bitcoin Depot filed an application for return of seized property, seeking return of the $14,100.00 cash seized from the Bitcoin ATM. On March 18, Carlson filed a motion to intervene, which was granted by the district court, as well as a competing claim for the return of the $14,100.00 seized funds. On March 21, the district court held a hearing on the competing return-of-seized-property claims. On April 30, the district court ordered the Linn County Sheriff's Office to return the $14,100.00 seized funds to Carlson. Bitcoin Depot appealed that decision, and we retained the appeal.

II.

The underlying proceedings were equitable in nature, involving competing claims for return of seized property—i.e., requests for specific performance. Neither party sought damages or remedies at law. Accordingly, our standard of review is de novo. *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 684 (Iowa 2020).

Under Iowa Code section 809.5, when property seized by law enforcement is no longer required for evidentiary or investigative use and no forfeiture claim has been filed on behalf of the state, the "[s]eized property shall be returned to the owner . . . if the owner's possession is not prohibited by law." Iowa Code § 809.5(1). Subsection (2) clarifies that "property which has been seized shall be returned to the person who demonstrates a right to possession." *Id.* § 809.5(2). Linn County filed a brief in the district court, informing the district court that the State had not filed a forfeiture claim and that it had photographed the bills removed from the Bitcoin ATM, so it no longer needed to keep the actual currency for its continuing investigation. Accordingly, we must decide whether Bitcoin

Depot or Carlson has the greater right to possession of the $14,100.00 seized funds.

> In its application for return of the seized funds, Bitcoin Depot argued that

> Mrs. Carlson agreed to only transfer Bitcoins to wallets that she controlled. Nevertheless, she transferred Bitcoins to an outside wallet as directed in response to the alleged scammer.

> . . . On Mrs. Carlson's direction, Bitcoin Depot procured and advanced Bitcoins for Mrs. Carlson in approximately the value of the Funds. If the Funds are not returned to Bitcoin Depot, Bitcoin Depot will suffer a loss in the amount of Bitcoins it advanced on Mrs. Carlson's direction, but was not compensated for.

In support of its application for return of seized property, Bitcoin Depot filed an affidavit from its assistant general counsel, Joel Rimby. As set forth in Rimby's affidavit:

> 8. When individuals deposit money into an ATM owned by Bitcoin Depot, they are prompted to review and approve terms and conditions prior to proceeding. . . .

> . . . .

> 10. During transactions, a customer is presented with a prompt that asks if the Bitcoin is going to their digital wallet or someone else's wallet. If the customer selects that the Bitcoin is going to someone else's wallet, the customer is prohibited from completing the transaction.

> 11. Further, customers must acknowledge as part of the terms and conditions that they understand that all cash deposited into a machine owned by Bitcoin Depot becomes property of Bitcoin Depot upon deposit.

> 12. The reason that cash deposited in a Bitcoin Depot machine must become property of Bitcoin Depot is because when a user places cash into a Bitcoin Depot machine and initiates a transaction, Bitcoin Depot must transfer Bitcoins from its own inventory and send those Bitcoins to the wallet directed by the user.

Bitcoin Depot also attached a copy of its terms and conditions to Rimby's affidavit. As relevant here, Bitcoin Depot's terms and conditions provide: "[Y]ou

agree to accept responsibility for all activities that occur through use of your Account . . . [and] you expressly represent and warrant that you will only send funds to your own personal wallet and not the wallet of any third party individual or entity."

In her competing claim for return of the $14,100.00 seized funds, Carlson did not dispute that she had entered into a binding contract pursuant to Bitcoin Depot's terms and conditions when she deposited cash into the ATM. Instead, she argued that "[t]he $14,100.00 in question was taken from Ms. Carlson through criminal acts under Iowa Code Chapter 714, perpetrated by a yet to be identified individual, thus returning said funds [to Bitcoin Depot] would continue to victimize Ms. Carlson for crimes committed against her." As between her and Bitcoin Depot, Carlson argues that she is entitled to possession of the seized funds because their contract is voidable due to third-party duress, relying on the Restatement (Second) of Contracts. Section 175 provides:

> If a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction.

Restatement (Second) of Conts. § 175(2) (Am. L. Inst. 1981). The comments emphasize that the voidability rule has "an important exception if the other party has, in good faith and without reason to know of the duress, given value or changed his position materially in reliance on the transaction." *Id.* § 175 cmt. *e.*

Carlson, as the party seeking to void the contract based on third-party duress, has the burden of proving that Bitcoin Depot had reason to know of the duress. *See, e.g., Fees v. Mut. Fire & Auto. Ins. Co.*, 490 N.W.2d 55, 58 (Iowa 1992) ("[T]he burden of proving economic duress is upon the party alleging it."). Carlson does not dispute that Bitcoin Depot transferred Bitcoins from its

own inventory to the specified wallet, thereby giving value. So, Carlson's claim to the seized funds turns on whether Bitcoin Depot did so "without reason to know of the duress" under which Carlson deposited the funds into the ATM.

According to Carlson, the above-pictured warning that appears on the Bitcoin ATM screen demonstrates that Bitcoin Depot had "reason to know" of Carlson's duress. Carlson argues that by providing the warning to customers, Bitcoin Depot acknowledges that its customers are often scammed by third parties in the way Carlson was here. The district court agreed with Carlson, characterizing Carlson's claim as "analogous to an owner's recovery of stolen property from a pawnbroker." The district court's order followed from its conclusion that using the Bitcoin ATM to purchase Bitcoins involved a "smart contract." In its order, the district court explained:

> The nature of smart contracting itself gives Bitcoin Depot reason to know of transactions being made under duress from a third party. Bitcoin's own warning indicates it knows that people are sometimes scammed into purchasing Bitcoin and placed it in the wallet of another.
>
> . . . .
>
> . . . When, as is the case here, the cash deposited by the victim is recovered, the victim of the scam has a superior right to it.

First, we disagree with the district court that this case is analogous to recovering stolen property from a pawnbroker. Pawnbrokers are regulated by statute. As relevant here, Iowa Code section 714.28(2) provides a process whereby a person whose property is stolen and delivered to a pawnbroker can recover the stolen property from the pawnbroker. The claimant is entitled to return of the property upon evidence of "the applicable law enforcement agency's report documenting the misappropriation of the property." *Id.*

But Bitcoin Depot is not a pawnbroker and is not subject to regulations specific to pawnbrokers. And even if the analogy fit, Carlson's transaction with Bitcoin Depot did not involve stolen property. Rather, Carlson deposited her own cash that she withdrew from her personal bank account into a Bitcoin ATM. In exchange, Bitcoin Depot transferred 0.22960970 Bitcoins to the wallet specified by Carlson, which turned out to not be hers. In the pawnbroker analogy, Carlson gave her own cash to the pawnbroker, i.e., Bitcoin Depot. The Bitcoins were what were stolen, not the cash deposited into the Bitcoin ATM now held by the Linn County Sheriff's Office. Thus, we agree with Bitcoin Depot that the comparison of this transaction to the recovery of stolen property from a pawnbroker does not fit.

Second, we reject the district court's conclusion that the nature of a Bitcoin ATM transaction as a purported "smart contract" made Bitcoin Depot sufficiently aware of third-party duress to void its contract terms. The district court, relying on three legal journal articles, characterized Carlson's relationship with Bitcoin Depot as a smart contract, seemingly because the underlying Bitcoin transaction is nonreversible. *See, e.g.,* Deborah R. Gerhardt & David Thaw, *Bot Contracts*, 62 Ariz. L. Rev. 877, 877 (2020) ("[O]nce a smart contract is set in motion, no person or court can reverse the transaction. In this way, smart contracts differ fundamentally from traditional contracts because they leave no room for judicial intervention."); Mark Verstraete, *The Stakes of Smart Contracts*, 50 Loy. U. Chi. L.J. 743, 753 (2019) ("Smart contracts . . . are intended to circumvent—or at least be independent of—the state's contract law machinery."); Kevin Werbach & Nicolas Cornell, *Contracts Ex Machina*, 67 Duke L.J. 313, 333 (2017) ("With smart contracts, the transaction is irreversibly

encoded on a distributed blockchain. A judicial decision holding a smart contract unenforceable cannot undo the results of its fully executed agreement.").

Even if the Bitcoin ATM contract between Carlson and Bitcoin Depot was a smart contract, no one suggests that smart contracts are per se invalid. Yet that is the effect of the district court's analysis, which voids the contract based solely on the "nature of smart contracting." We do not agree that every Bitcoin transaction is a smart contract. Nor do we agree that smart contracts are not subject to the law and ordinary judicial process. *See* Werbach & Cornell, 67 Duke L.J. at 318 (explaining that smart contracts "will not . . . replace contract law," which is "a remedial institution"). Accordingly, we conclude that established contract law governs our analysis of the competing claims involved here. We turn our analysis to application of the Restatement (Second) of Contracts section 175(2), relied upon by Carlson to avoid the contract she admittedly entered into with Bitcoin Depot.

If a party enters a contract under duress from a third party, the contract is voidable by the victim "unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction." Restatement (Second) of Contracts § 175(2). Our appellate courts have applied section 175(2) in only one other Iowa case. In *Dorale v. Dorale*, Sandra Dorale sought to void a contract that she had entered into to convey property to Ray Dorale, her abusive ex-husband. *See* No. 08–0560, 2009 WL 1211969, at *1–2 (Iowa Ct. App. May 6, 2009). Sandra's father—the third party—pressured Sandra to sign a contract conveying her interest in eighty acres of farmland to Ray after a four-hour confrontation where Ray refused to leave the father's house until she signed the contract. *Id.* at *3. The court of appeals held:

Upon our de novo review we find that Sandra's manifestation of assent was induced, in large part if not entirely, by her father, not a party to the transaction, and that Ray was well aware of the pressure exerted on Sandra by her father. We conclude Sandra's manifestation of assent was the product of duress, as described in Restatement (Second) of Contracts, section 175(2), and is thus voidable and unenforceable.

*Id.* at *4. The contract to convey property to Ray was voidable because Ray was aware that Sandra entered the contract under duress.

Here, unlike the ex-husband in *Dorale* who was "well aware of the pressure exerted on" Sandra by her father to sign the contract so that Ray would leave without any violence, *id.*, there is no evidence in the record before us that Bitcoin Depot had reason to know that a scammer had contacted Carlson and told her that she needed to purchase Bitcoins from the Bitcoin ATM and transfer them into a specified wallet to avoid her accounts being impacted. Instead, the evidence in the record shows that Bitcoin Depot, through a largely automated process, transferred Bitcoins to the wallet specified by Carlson upon receipt of the cash into its ATM. This evidence is insufficient to void the contract under the Restatement (Second) of Contracts section 175(2). *See, e.g., Aylaian v. Town of Huntington,* 459 F. App'x 25, 27 (2d Cir. 2012) ("Although third-party duress may render a contract voidable, it cannot do so where the other contracting party gives value to the contract." (citing Restatement (Second) of Contracts § 175(2))); *McClain v. Warren,* No. 5:23–cv–00592–LCB, 2025 WL 685217, at *6 (N.D. Ala. Mar. 3, 2025) ("McClain may not avoid the contract if 'the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction.' . . . ASU provided value by tendering payments pursuant to the terms of the [agreement], and McClain accepted those payments. Moreover, there exists no indication any Defendant knew of any putative duress [that a third party] may have imposed upon

McClain." (quoting Restatement (Second) of Contracts § 175(2))); *Emps. Ins. of Wassau v. Bond,* Civ. A. No. HAR–90–1139, 1991 WL 8431, at *2 (D. Md. Jan. 25, 1991) ("[W]here the assent was induced by a third-party unrelated to the transaction and the opposing party to the transaction, without knowledge of the victim's duress, materially relied upon the victim's assent, the contract is not voidable." (citing Restatement (Second) of Contracts § 175)).

The only evidence Carlson offers to show Bitcoin Depot's purported knowledge that she deposited the cash into the ATM while under duress from a third party is the warning message—pictured above—provided to all of Bitcoin Depot's customers who use its ATMs to purchase Bitcoins.

Bitcoin Depot's generalized knowledge that sometimes scammers try to defraud people into transferring Bitcoins using Bitcoin's irreversibly encoded technology is insufficient to establish that Bitcoin Depot had "reason to know" of Carlson's particular duress. Carlson attempts to turn a warning against fraud into an admission of liability. That Bitcoin Depot recognizes how its ATMs could be misused and tries to warn its customers and make them more difficult to misuse does not in and of itself undermine the validity of the contract between Bitcoin Depot and the depositing customer just because a scammer is successful. If Bitcoin Depot's generalized notice was enough to remove it from the protections for contracting parties who "in good faith and without reason to know of the duress either give[] value or rel[y] materially on the transaction," Restatement (Second) of Contracts section 175(2), then every Bitcoin ATM deposit could be challenged as voidable due to third-party duress.

A better analogy might be to the product liability context. When a product manufacturer puts a warning label on a product about certain dangers or risks, the product manufacturer is not generally subject to liability if a consumer

ignores that warning and gets injured. Rather, the opposite is generally true: manufacturers avoid liability caused by their dangerous products specifically because they provided a sufficient warning. *See, e.g.*, *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 289–90 (Iowa 1994) (en banc) ("The relevant inquiry . . . is whether the reasonable manufacturer knew or should have known of the danger, in light of the generally recognized and prevailing best scientific knowledge, yet *failed* to provide adequate warning to users or consumers." (emphasis added)). Here, the fact that Bitcoin Depot recognized risks in its industry and the use of its ATMs and then warned its customers—to the point of barring a transaction unless the user certifies that the wallet is their own—does not make it liable for every improper transaction. It certainly does not show that Bitcoin Depot had reason to know that Carlson was the victim of duress when she deposited cash into the ATM and directed Bitcoin Depot to transfer Bitcoins into a wallet that was not her own.

Based on the evidence presented to the district court, Carlson has not met her burden to show that Bitcoin Depot had reason to know of Carlson's duress. The contract between Bitcoin Depot and Carlson is therefore not voidable. We recognize that Carlson alleges that she was the victim of fraud, but this proceeding determines only who has the greater right to possession of the funds seized and held by the Linn County Sheriff's Office. As between Carlson and Bitcoin Depot, that is Bitcoin Depot.

III.

We reverse the district court order and remand the case with instructions to return the seized funds to Bitcoin Depot.

**Reversed and Case Remanded with Instructions.**